Archie Nathaniel **BIGGERS**, Petitioner-Appellee,

v.

William S. **NEIL**, Warden, Tennessee State Penitentiary, Nashville, Tennessee, Respondent-Appellant.

No. 20540.

United States Court of Appeals, Sixth Circuit.

Aug. 18, 1971.

---

Brooks, Circuit Judge, dissented and filed opinion.

Thomas E. Fox, Deputy Atty. Gen., Nashville, Tenn., for appellant.

Michael Meltsner, Jack Greenberg, New York City, Anthony G. Amsterdam, Stanford, Cal., Avon N. Williams, Jr., Z. Alexander Looby, Nashville, Tenn., on the brief; John P. Howland, Port Washington, N. Y., of counsel, for appellee.

Before EDWARDS, McCREE and BROOKS, Circuit Judges.

EDWARDS, Circuit Judge.

In this case we are asked by the State of Tennessee to review and reverse the issuance of a writ of habeas corpus sought by petitioner Biggers in the United States District Court for the Middle District of Tennessee. After a full hearing and after review of the full record of the proceedings in the state courts of Tennessee wherein Biggers had been convicted of rape and sentenced to 20 years in Tennessee's State Vocational Training School, the District Judge found that identification procedures employed by Nashville police and subsequently made the subject of extensive testimony at trial had been so essentially unfair as to represent a depri-

vation of appellant's federal constitutional right to due process of law. He ordered Tennessee either to retry appellant or release him.

The District Court found the facts pertinent to issuance of the writ as follows:

"On the evening of January 22, 1965, Mrs. Margaret Beamer was attacked at knife-point by an intruder who broke into her home. Mrs. Beamer's screams aroused her thirteen-year old daughter who rushed to the scene and also began to scream. At this point, the intruder is alleged to have said to Mrs. Beamer, 'You tell her to shup up, or I'll kill you both.' This Mrs. Beamer did, whereupon she was taken from the house to a spot two blocks away and raped. The entire episode occurred in very dim light and the rape itself occurred in moonlight. As a result, Mrs. Beamer could give only a very general description of her assailant, describing him as being fat and flabby with smooth skin, bushy hair and a youthful voice.

"Over a seven month period following the crime the police showed Mrs. Beamer various police photographs and had her attend several 'line-ups' and 'show-ups.' However, the victim was unable to identify any of the persons shown to her as being her assailant. Finally, on August 17, 1965, petitioner was arrested as a suspect in the rape of another woman. While petitioner was being detained in connection with that case the police asked Mrs. Beamer to come to the police station to 'look at a suspect.' The identification process employed at this point was called a show-up.

\*   \*   \*   \*   \*   \*

"At the instant show-up Mrs. Beamer identified petitioner as being her assailant. As to what transpired at the show-up, there is some conflict between the testimony given by Mrs. Beamer at the trial and that given by her at the evidentiary hearing held in this court on October 30, 1969. In testimony given at the trial, Mrs. Bea-

mer testified that on viewing the petitioner the 'first thing' that made her think he might be her assailant was his voice. However, at the October hearing, Mrs. Beamer testified that she identified petitioner positively prior to having him speak the words spoken by Mrs. Beamer's attacker more than seven months earlier during the crime—'You tell her to shut-up or I'll kill you both.' There is also conflict between the testimony given by police officers at the trial and that given by them at the October hearing as to whether or not identification of petitioner was made before or after he was asked to speak these words.

"At any rate, petitioner was identified at this show-up as being Mrs. Beamer's attacker, and the subsequent indictment and conviction of petitioner was based almost exclusively upon this station house identification.[1]

"1. There is considerable doubt on reading the trial record as to whether or not Mrs. Beamer made a positive in-court identification of petitioner at the time of the trial."

The District Judge reviewed this record on a legal standard recently reiterated by the United States Supreme Court in language which is directly applicable here:

"In United States v. Wade, 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967), and Gilbert v. California, 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178] (1967), this Court held that because of the possibility of unfairness to the accused in the way a lineup is conducted, a lineup is a 'critical stage' in the prosecution, at which the accused must be given the opportunity to be represented by counsel. That holding does not, however, apply to petitioner's case, for the lineups in which he appeared occurred before June 12, 1967. Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967). But in declaring the rule of *Wade* and *Gilbert* to be applicable only to lineups conducted after those cases were decided, we recog-

nized that, judged by the 'totality of the circumstances,' the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law. *Id.*, [388 U.S.] at 302 [87 S. Ct. at 1972]. See Simmons v. United States, 390 U.S. 377, 383 [88 S.Ct. 967, 970, 19 L.Ed.2d 1247] (1968); cf. P. Wall, Eye-Witness Identification in Criminal Cases; J. Frank & B. Frank, Not Guilty; 3 J. Wigmore, Evidence § 786*a* (3d ed. 1940); 4 *id.*, § 1130." Foster v. California, 394 U. S. 440, 442, 89 S.Ct. 1127, 1128, 22 L. Ed.2d 402 (1968).

Employing the term "show-up" to refer to a situation where police bring a single suspect before a victim of crime for identification purposes, the District Judge held:

"On this basis the Court must conclude that the circumstances here present are not such as to warrant the show-up procedure and, consequently, that its use at petitioner's trial denied him due process of law.

\*   \*   \*   \*   \*   \*

[T]here is no indication that a truly concerted effort was made to produce suitable subjects for a line-up. Aside from a phone call to the juvenile home and a screening of Metro Jail inmates *no other efforts were made*. There are several other prison facilities in the area and there is no evidence that any effort was made to screen them for subjects. The Court sees no reason why this could not have been done in order to maximize the fairness of the identification process. Here, there was no evidence of any deathbed urgency as in *Stovall* which would have precluded the police from delaying the identification procedure until a suitable line-up could have been arranged. The crime was seven months old, the victim was fully recovered and well, and there are no other indications that the ends of justice demanded an immediate *show-up* rather than a much more reliable line-up. Fur-

thermore, none of the other circumstances which the above discussed cases indicate may justify a show-up existed in the instant case. The evidence clearly shows that the complaining witness did not get an opportunity to obtain a good view of the suspect during the commission of the crime.[2]

"2. The only other eye-witness, Mrs. Beamer's daughter could not identify Biggers. *And see*, the case of United States ex rel. Garcia v. Follette, *supra* [417 F.2d 709 (2d Cir. 1969)] and accompanying text and cases.

Also, the show-up confrontation was not conducted near the time of the alleged crime, but, rather, some seven months after its commission.[3] Finally

"3. See the case of United States ex rel. Williams v. LaVallee, *supra*, [415 F.2d 643 (2d Cir. 1969), cert. denied 397 U.S. 997, 90 S.Ct. 1139, 25 L.Ed.2d 406 (1971)] and accompanying text and cases.

the witness in the instant case was unable to give either an independent photographic identification of the suspect or a good physical description of her assailant.[4] The nature of the

"4. See the case of United States v. Thompson, *supra*, [417 F.2d 196 (4th Cir. 1969), cert. denied, 396 U.S. 1047, 90 S.Ct. 699, 24 L.Ed.2d 692 (1970)] and accompanying text and cases.

show-up as conducted in this case— with the great lapse of time between the crime and the identification, the hesitancy of the witness in identifying the petitioner,[5] the circumstances of

"5. See United States v. Gilmore, *supra* [398 F.2d 679 (7th Cir. 1968)] and accompanying text." (Footnotes in quotation.)

the stationhouse confrontation coupled with Mrs. Beamer's knowledge that petitioner was thought by police to be her assailant,—tended to maximize the possibility of misidentification of the petitioner. True, it may have been more convenient for the police to have a show-up. However, in matters of constitutional due process where police convenience is balanced against the need to extend basic fairness to the suspect in a criminal case, the latter

value should always outweigh the former. In this case it appears to the Court that a line-up, which both sides admit is generally more reliable than a show-up, could have been arranged. The fact that this was not done tended needlessly to decrease the fairness of the identification process to which petitioner was subjected.

"Due process of law and basic fairness demand that the most reliable method of identification possible be used in a criminal case. See, Simmons v. United States, *supra,* [390 U. S. 377 (1967)] at 383–384 [88 S.Ct. 967, 19 L.Ed.2d 1214]. The conduct of the show-up in this case created an atmosphere which was so suggestive as to enhance the chance of misidentification and hence constituted a violation of due process.

"Clearly, this identification did not amount to a harmless error, since the victim's identification of petitioner was virtually the only evidence upon which the conviction was founded. See, Chapman v. California, 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1966).

\* \* \* \* \* \*

"Accordingly, judgment will be entered granting the application of Archie Nathaniel Biggers for a writ of habeas corpus, voiding the conviction obtained in the state court, and discharging the petitioner from custody after the state has had a reasonable time to retry him upon the same charge, any such new trial to be 'unaffected by Mrs. Beamer's station-house identification and the testimony of the police officers who were present when it took place.' Biggers v. Tennessee, *supra* at 409, [390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968)]."

We too have reviewed the state trial court record and the appellate record above that, as well as the somewhat dif-ferent transcript developed in the testimony before the District Judge. We believe the record does not allow us to find that the conclusions of fact of the District Judge are clearly erroneous.

In addition, we find no error in the District Judge's understanding of the principles of due process of law as they apply to identification proceedings prior to decision of the *Wade* [1], *Gilbert* [2] cases. Normally this would mean affirmance of the judgment on the careful opinion written by Judge Miller [3] in the court below.

What divides our panel, however, is the effect of the direct appeal proceedings which preceded the instant federal habeas corpus case. These included affirmance of appellant Biggers' conviction by the Supreme Court of Tennessee, a grant of certiorari by the United States Supreme Court, and the subsequent affirmance of the decision of the Supreme Court of Tennessee by an equally divided vote of the membership of the United States Supreme Court. Our brother finds in the appellate proceedings which culminated with a 4–4 affirmance by the United States Supreme Court a final adjudication of all due process issues arising out of the pretrial identification measures employed in relation to appellant Biggers. As we understand the matter, he regards the 4–4 vote as the expression of a final *federal* view upon the critical due process question involved in this appeal, and believes that it precluded the District Judge from entertaining, taking testimony on, or making findings of fact in relation to the pretrial identification process in the course of appellant Biggers' petition for a federal writ of habeas corpus.

There are three reasons which compel our disagreement:

■ First, the District Judge decided a different question than that which had

---

1. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

2. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

3. Judge William E. Miller is now a member of the United States Court of Appeals for the Sixth Circuit.

been presented to the United States Supreme Court on certiorari.

The question upon which certiorari was granted as stated in the Application for Certiorari was:

"The petitioner, a 16 year-old Negro boy, was compelled by the police, while alone in their custody at the police station, to speak the words spoken by a rapist during the offense almost eight months earlier for *voice identification* by the prosecutrix.

"Was the denial of petitioner's right to personal dignity and integrity by the police, and the failure to give him benefit of counsel, provide him with a line-up, or with any other means to assure an objective, *impartial identification of his voice* by the prosecutrix a violation of petitioner's Fifth, Sixth and Fourteenth Amendment rights?" (Emphasis added.)

As is clear from the quotation below from Judge Miller's opinion, he expressly did not decide the effect of the voice identification, except perhaps as a portion of "the totality of circumstances" of an impermissibly suggestive show-up:

"[T]he Court finds it unnecessary to reach the issue of whether voice identification as used here amounted in itself to a violation of due process. It may be that the validity of such identification should normally be left to the jury. Since the voice identification took place during the show-up and the show-up procedure itself is unconstitutional as employed in this case, there is no reason to reach the specific issue raised concerning voice identification."

■ While obviously four members of the court felt that the grant of certiorari opened the door for consideration of a broad due process question, it is entirely possible that some or all of the four members who voted against reversal did so solely on the voice identification issue squarely represented by the application for certiorari.[4]

■ Secondly, as we understand the controlling decisions of the United States Supreme Court, we believe that the doctrine of res judicata does not apply in the usual sense in federal habeas corpus proceedings. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

In Fay v. Noia the Supreme Court said:

"The breadth of the federal courts' power of independent adjudication on habeas corpus stems from the very nature of the writ, and conforms with the classic English practice. As put by Mr. Justice Holmes in his dissenting opinion in Frank v. Mangum, *supra*, [237 U.S.,] at 348 [35 S.Ct. at 595]: 'If the petition discloses facts that amount to a loss of jurisdiction in the trial court, jurisdiction could not be restored by any decision above.' It is of the historical essence of habeas corpus that it lies to test proceedings so fundamentally lawless that imprisonment pursuant to them is not merely erroneous but void. *Hence, the familiar principle that res judicata is inapplicable in habeas proceedings,* see *e.g.,* Darr v. Burford, 339 U.S. 200, 214 [70 S.Ct. 587, 595, 94 L.Ed. 761]; Salinger v. Loisel, 265 U.S. 224, 230 [44 S.Ct. 519, 521, 68 L.Ed. 989]; Frank v. Mangum, 237 U.S. 309, 334 [35 S.Ct. 582, 589, 59 L. Ed. 969]; Church, Habeas Corpus (1884), § 386, is really but an instance of the larger principle that void judgments may be collaterally impeached. Restatement, Judgments (1942), §§ 7, 11; Note, Res Judicata, 65 Harv.L. Rev. 818, 850 (1952). Cf. Windsor v. McVeigh, 93 U.S. 274, 282–283 [23 L.

4. Since certiorari was granted on the issue of voice identification, the briefs presented before the Supreme Court (quoted at length in Judge Brooks' dissent) could not expand the scope of the Supreme Court's consideration merely by discussing broader due process questions.

Ed. 914]. So also, the traditional characterization of the writ of habeas corpus as an original (save perhaps when issued by this Court) civil remedy for the enforcement of the right to personal liberty, rather than as a stage of the state criminal proceedings or as an appeal therefrom, emphasizes the independence of the federal habeas proceedings from what has gone before. This is not to say that a state criminal judgment resting on a constitutional error is void for all purposes. *But conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review."* Fay v. Noia, *supra* 372 U.S. at 422–424, 83 S.Ct. at 840–841. (Emphasis added.) (Footnotes omitted.)

In *Sanders*, the Supreme Court discussed the same principle:

"*At common law, the denial by a court or judge of an application for habeas corpus was not res judicata.* King v. Suddis, 1 East 306, 102 Eng. Rep. 119 (K.B.1801); Burdett v. Abbot, 14 East 1, 90, 104 Eng.Rep. 501, 535 (K.B.1811); Ex parte Partington, 13 M. & W. 679, 153 Eng.Rep. 284 (Ex. 1845); Church, Habeas Corpus (1884), § 386; Ferris and Ferris, Extraordinary Legal Remedies (1926), § 55. 'A person detained in custody might thus proceed from court to court until he obtained his liberty.' Cox v. Hakes, 15 A.C. 506, 527 (H.L., 1890). That this was a principle of our law of habeas corpus as well as the English was assumed to be the case from the earliest days of federal habeas corpus jurisdiction. Cf. Ex parte Burford, 3 Cranch 448 [2 L.Ed. 495] (Chief Justice Marshall). Since then, it has become settled in an unbroken line of decisions. Ex parte Kaine, 3 Blatchf. 1, 5–6 (Mr. Justice Nelson in Chambers); In re Kaine, 14 How. 103 [14 L.Ed. 345]; Ex parte Cuddy, 40 F. 62, 65 (Cir.Ct.S.D.Cal.

1889) (Mr. Justice Field); Frank v. Mangum, 237 U.S. 309, 334 [35 S.Ct. 582, 590, 59 L.Ed. 969]; Salinger v. Loisel, 265 U.S. 224, 230 [44 S.Ct. 519, 521, 68 L.Ed. 989]; Waley v. Johnston, 316 U.S. 101 [62 S.Ct. 964, 86 L.Ed. 1302]; United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 263, n. 4 [74 S.Ct. 499, 501, 98 L.Ed. 681]; Heflin v. United States, 358 U. S. 415, 420 [79 S.Ct. 451, 454, 3 L.Ed. 2d 407] (opinion of Mr. Justice Stewart) (dictum); Powell v. Sacks, 303 F.2d 808 (C.A. 6th Cir. 1962). Indeed, only the other day we remarked upon 'the familiar principle that *res judicata* is inapplicable in habeas proceedings.' Fay v. Noia, 372 U.S. 391, 423 [83 S.Ct. 822, 840, 9 L.Ed.2d 837].

"It has been suggested, see Salinger v. Loisel, *supra*, 265 U.S. at 230–231 [44 S.Ct., at 521–522, 68 L.Ed. 989] that this principle derives from the fact that at common law habeas corpus judgments were not appealable. But its roots would seem to go deeper. Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged. If 'government [is] always [to] be accountable to the judiciary for a man's imprisonment,' Fay v. Noia, *supra*, 372 U.S. at 402 [83 S.Ct. at page 829] access to the courts on habeas must not be thus impeded. *The inapplicability of res judicata to habeas, then, is inherent in the very role and function of the writ."* Sanders v. United States, *supra*, 373 U.S. at 7–8, 83 S.Ct. at 1072–1073. (Emphasis added.) (Footnotes omitted.)

■ Thirdly, we do not believe that logically or historically a 4–4 division of the United States Supreme Court can be held to represent any federal adjudication of appellant's federal constitutional claims on the merits.

■ An equal division of an appellate court does not settle any principle of law or issue of fact for that court. It represents affirmance of the judgment ap-

pealed from because there were insufficient votes for reversal.

Supreme Court opinions which we believe to be settled law demonstrates both principles:

"In the very elaborate arguments which have been made at the bar, several cases have been cited which have been attentively considered. *No attempt will be made to analyze them, or to decide on their application to the case before us, because the judges are divided respecting it. Consequently, the principles of law which have been argued cannot be settled;* but the judgment is affirmed, the court being divided in opinion upon it." Etting v. Bank of United States, 11 Wheat. 59, 24 U.S. 59, 76, 6 L.Ed. 419 (1826). (Emphasis added.)

"In cases of appeal or writ of error in this court, the appellant or plaintiff in error is always the moving party. It is affirmative action which he asks. The question presented is, shall the judgment, or decree, be reversed? *If the judges are divided, the reversal cannot be had, for no order can be made. The judgment of the court below, therefore, stands in full force, it is indeed, the settled practice in such case to enter a judgment of affirmance; but this is only the most convenient mode of expressing the fact that the cause is finally disposed of in conformity with the action of the court below, and that that court can proceed to enforce its judgment. The legal effect would be the same if the appeal, or writ of error, were dismissed.*" Durant v. Essex Co., 7 Wall. 107, 74 U.S. 107, 112, 19 L.Ed. 154 (1868). (Emphasis added.)

"Four members of the Court would reverse. Four members of the Court would dismiss the writ as improvidently granted. *Consequently, the judgment of the United States Court of Appeals for the Sixth Circuit remains in effect.*" Anderson v. Johnson, Warden, 390 U.S. 456, 88 S.Ct. 1194, 20 L.Ed.2d 27 (1968). (Emphasis added.)

As we read these decisions, the equally divided vote of the United States Supreme Court in Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968), means only that "the judgment of [the Supreme Court of Tennessee] remains in effect." Anderson v. Johnson, *supra*, 390 U.S. at 456, 88 S.Ct. at 1194. There is, of course, no doubt that federal habeas corpus allows for subsequent federal review of claims of federal constitutional violations after final state court judgment. And it is clear from the opinion of the Supreme Court of Tennessee, 411 S.W.2d 696 (1967), that it neither considered nor decided the federal constitutional validity of the "show-up" which the District Judge on habeas found invalid.

The judgment of the District Court is affirmed.

BROOKS, Circuit Judge (dissenting).

I respectfully dissent. As indicated in the majority opinion, this is an appeal by the State of Tennessee from an order of the District Court granting petitioner-appellee, Archie Nathaniel Biggers, a writ of habeas corpus. Petitioner Biggers was convicted in state court for the crime of rape. Upon appeal to the Supreme Court of Tennessee the conviction was affirmed. Biggers v. State, 219 Tenn. 553, 411 S.W.2d 696 (1967), reh. denied March 1, 1967. An appeal to the United States Supreme Court followed. Certiorari was granted, 388 U.S. 909, 87 S.Ct. 2132, 18 L.Ed.2d 1347 (1967), and the Supreme Court affirmed the judgment of the Supreme Court of Tennessee by an equally divided Court. Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1967), reh. den. 390 U.S. 1037, 88 S.Ct. 1401, 20 L.Ed.2d 298 (1967). Petitioner then brought this action for a writ of habeas corpus. The District Court granted the writ, basing its decision to set aside petitioner's state conviction upon its conclusion that the totality of circumstances surrounding petitioner's pretrial identification presented a significant possibility of ir-

reparably mistaken identification,[1] and, therefore, petitioner's constitutional due process rights were violated when this identification (the sole identification evidence) was testified to by the police at the state trial. A number of other constitutional challenges were raised, however, since the District Court concluded that the pretrial identification prejudiced petitioner's constitutional rights, it did not reach the merits of the other claims. For reasons hereafter stated, I would reverse the judgment and remand to the District Court for consideration of the other claims raised by the petition for habeas corpus.

The State of Tennessee has raised two issues on this appeal. First, whether the District Court properly entertained the petition for habeas corpus in light of the United States Supreme Court's affirmance of petitioner's conviction. Second, whether petitioner was denied a fair trial as a result of the use of the identification evidence allegedly the by-product of an unconstitutional identification procedure. The District Court decided both issues in favor of petitioner Biggers, and the State of Tennessee contends both conclusions are erroneous. While the issues as formulated by the State of Tennessee generally convey the nature of the questions under review, they do not accurately delineate the legal controversy involved. Thus, there is really no doubt that the District Court had the power to entertain the petition for habeas corpus, however, the essence of the dispute is whether the power of the court to collaterally review petitioner's state conviction extended to the issue of the constitutional infirmity of the pretrial identification procedure. And the question which divides this Court is what effect, if any, did the United States Supreme Court's equally divided affirmance of petitioner's state conviction have upon subsequent District

Court reconsideration, by collateral review, of the identical issue presented to the Supreme Court. I view the crucial issue in this case as essentially one of litigious finality in criminal matters. See Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441 (1963), for a discussion of relevant policy considerations.

The District Court's conclusion on the matter of finality is summed up by its holding that:

"The fact that petitioner's conviction was technically affirmed by reason of the United States Supreme Court's even division of opinion is of no consequence here since the merits of the claim were not adjudicated. Even if they had been adjudicated, *Sanders* shows that those claims would not have been automatically barred from consideration by this Court in a habeas corpus proceeding."

The District Court, as well as the majority opinion construe the language in Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1962), and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1962), that principles of "res judicata are inapplicable in habeas proceedings" to mean that a District Court has jurisdiction to entertain any and all claims raised by a habeas corpus petition. However, I do not interpret that language employed in *Sanders* and *Noia, supra,* to mean there is no finality in a criminal matter. Clearly a criminal defendant having had a particular issue fully litigated first in state court and then federal court, simply cannot turn around upon an adverse resolution of the issue and start the whole process of litigating the question again. The point is well taken, and I do not see a difference of views on the question, that res judicata will not bar the criminal defendant from beginning a habeas corpus proceed-

---

1. Petitioner's identification preceded the decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and the standards established by those cases are not to be applied retroactively, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

ing in the United States District Court which raises new issues or issues not fully litigated in the state or federal courts. However, logic and precedent dictate that a defendant is collaterally estopped from relitigating the merits of an issue plenarily litigated and resolved on the merits against him. See Gaitan v. United States, 295 F.2d 277, 280 (10th Cir. 1961), cert. denied 369 U.S. 857, 82 S.Ct. 939, 8 L.Ed.2d 15 and 9 A. L.R.3d 213, discussing the confusion resulting from the indiscriminate use of res judicata nomenclature. Also see, United States ex rel. Schnitzler v. Follette, 406 F.2d 319, 322 (2nd Cir. 1969), cert. denied 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244, basing a similar holding on the principle of stare decisis.

As has been indicated, the difficult question dividing this Court is whether the issue of the constitutional infirmity of the pretrial identification procedure has been fully litigated. That is, was the equally divided affirmance by the United States Supreme Court of petitioner Biggers' conviction an adjudication on the merits of the pretrial identification issue. The majority feels that the constitutionality of the entire identification procedure had not been scrutinized by the Supreme Court in the original appeal because 1) the District Judge felt he was deciding a different question than that presented to the Supreme Court that is, the District Judge concentrated his attention on the legality of the show-up rather than on the constitutionality of the voice identification; 2) the application for certiorari filed in the Supreme Court by petitioner stresses only the constitutionality of the voice identification; and 3) there is no positive indication in Mr. Justice Douglas' dissenting opinion in Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed. 2d 1267 (1968), that more than four Justices considered a "broad due process question". I disagree and believe the record simply does not support the majority's conclusion that the constitutionality of the entire pretrial identification

procedure was not wholly reviewed by the Supreme Court.

First, I fail to see what significance can be attached to the fact that the District Court felt that it was deciding a different question than that which was presented to the Supreme Court. Just because the District Court took special interest in the legality of the show-up in assessing the "totality of circumstances" does not mean the Supreme Court ignored consideration of that fact or concentrated solely on the voice identification in applying the "totality" test. Moreover, the appellate record shows that the Supreme Court had before it all facets of the identification procedure in reviewing the case on certiorari. Thus, I see no importance in the fact that the District Court chose to emphasize a previously considered aspect of the totality of the identification procedure in determining its constitutionality.

Secondly, I find absolutely no support in the Supreme Court appellate record for the majority's position that Biggers' application for certiorari limited the Court's review only to the constitutionality of the voice identification as, quite to the contrary, the record clearly shows that the entire spectrum of factors surrounding the identification procedure was presented in a broad due process challenge to the conviction. As a preliminary observation, it should be emphasized that even on this appeal petitioner has admitted in his brief that the Supreme Court reviewed the broad due process question. In footnote five of petitioner's brief it is stated:

"The [Supreme] Court heard arguments and considered briefs with respect to whether Biggers' Fifth and Fourteenth Amendment rights had been abridged in (1) his identification violated the Due Process Clause under the totality of circumstances test adopted in Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967) and (2) the use at trial of words which Biggers' was compelled to speak solely for purposes of voice identification violated the Fifth

Amendment as incorporated in the Fourteenth. The latter question had been reserved by the Court in United States v. Wade, 388 U.S. 218 at 223 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967)."

While Biggers' application for certiorari was phrased so as to emphasize the voice identification question, the State of Tennessee's statement of the issues presented in its "Brief In Opposition to the Petition for Writ of Certiorari" definitely indicates a broader due process factual review.[2] Furthermore, the briefs accompanying the application for the writ of certiorari and the actual briefs filed once the writ was granted unquestionably show that all factors surrounding the identification procedure were raised for review in the broadest due process challenge possible. I recognize and regret that quoting from these documents will substantially lengthen this dissenting opinion, but I feel that it is necessary to demonstrate conclusively that the Supreme Court had before it all aspects of the identification procedure in hearing the original appeal in this case, that there has been plenary review of that issue, and that no new issues of fact or law regarding this question were raised by petitioner in his habeas corpus request.[3]

In the appeal to the Supreme Court the grounds for granting certiorari were presented through Biggers' "Petition and Brief for Writ of Certiorari". In that document at pages 7–8, under subti-

tle "Reasons for Granting the Writ", it is argued:

*Petitioner Was Denied His Rights Under the Due Process Clause of the Fourteenth Amendment and the Fifth and Sixth Amendments to the United States Constitution Under Circumstances Similar to Those in Conflicting Court of Appeals Cases Granted Certiorari and Presently Pending Before This Court.*

The facts in this case are starkly simple, but they raise a critical question of the fairness and impartiality of police identification practices. They reveal that Archie Biggers was denied his right to a fair trial by police practices which denied him elementary Fourteenth Amendment protections.

The only evidence against petitioner at trial was the identification made by the prosecutrix, Mrs. Margaret Beamer, that Archie Biggers was the man who had raped her. Biggers, a 16 year old Negro was arrested early on the morning of August 17, 1965 and charged with the attempted rape of another woman (Tr. 70). Later the same day, the police brought Mrs. Beamer, who had been raped on the night of January 22, 1965, almost eight months earlier (Tr. 4–7, 20, 85–88) to "look at a suspect" (Tr. 27–28, 57, 106, 109–110). Unable to describe or identify her assailant (Tr. 13) her case had remained without clues. Asked to identify Biggers if she

---

2. Question II in the State of Tennessee's brief under the subtitle "Questions Presented" was "Whether or not the Sixth Amendment to the United States Constitution relating to assistance of counsel requires counsel to be present during the *identification procedure*, (1) when the investigation is but a general inquiry into an unsolved crime, and (2) when held prior to commencement of criminal proceedings". [Emphasis in original]. And, in the State of Tennessee's "Supplemental Brief In Opposition to the Petition for the Writ of Certiorari" the question specifically addressed was "whether or not petitioner was denied

due process of law by the identification procedure followed at the police headquarters * * *."

3. An additional reason for quoting at some length from these documents is that they are not readily available. In quoting from these materials, I have omitted footnotes and references to transcript pages, however, the complete record of all documents filed in this case in the Supreme Court may be found in Volume 51, Transcripts of Records and File Copies of Briefs, Nos. 232–237, Supreme Court of the United States, October Term 1967.

could, the first view she had of the petitioner was of him alone in the custody and presence of five police officers (Tr. 112). He had no lawyer. The police then required him to speak the exact words of the rapist spoken during the offense (Tr. 6, 7, 17, 47, 93, 108, 112–113, 156), on the basis of which she identified petitioner as the rapist. These were the circumstances surrounding the identification by the prosecutrix.

The facts in this case raise the issue present in conflicting Second and Fifth Circuit cases which this Court has granted certiorari to determine. United States ex rel. Stovall v. Denno, 355 F.2d 731 (2nd Cir. 1966), cert. granted 34 U.S.L. Week 3429 (June 20, 1966); Wade v. United States, 358 F.2d 557 (5th Cir. 1966), cert. granted 35 U.S.L. Week 3124 (Oct. 10, 1966). The Second Circuit, sitting en banc, held that the defendant's Fifth, Sixth and Fourteenth Amendment rights were not violated when he was taken to the victim's hospital room for identification without the benefit of a line-up or counsel, even though arraignment had been postponed to allow him to obtain counsel. The Fifth Circuit, in Wade v. United States, supra, specifically adopted the view of the dissenting judges in United States ex rel. Stovall v. Denno, supra. It excluded testimony of the line-up on the ground that the line-up had violated the defendant's constitutional rights because two witnesses had seen him in the custody of the police shortly before the line-up, and defendant's counsel had not been notified and was not present at the line-up. Archie Biggers, like Wade, was denied elemental protections against suggestion and the right to counsel during the test to identify his voice. Indeed, the circumstances of Biggers' identification were less conducive to impartiality than those in United States v. Wade, supra, and the arguable necessity for speed in identification and difficulting in arranging a line-up involved in

United States ex rel. [Stovall] Denno, supra, is not present in this case.

In subsection II of that subtitle ("The Facts in This Case Show That Petitioner Was Denied Due Process of Law and the Protection of the Fifth and Sixth Amendments to the Constitution of the United States") it is argued:

To negate inference or suggestion from an identification proceeding, a line-up is generally regarded as essential to provide a mode of comparison by police authorities. See Criminal Investigation and Interrogation, Gerber and Schroeder ed., § 22.20 (1962); Criminal Investigation, Jackson ed. (5th ed. 1962) at pp. 41–42. The failure to provide Archie Biggers with the protection of a line-up in a rape case, considering his youth, the eight month period since the rape and other circumstances is inexcusable. There was no reason for the lack of a line-up, and every reason to provide one. As Archie Biggers was being held in police custody for an unrelated charge, this is not a case of street identification immediately after arrest, nor even a case where it was physically impossible to hold a line-up. Nor was there need to identify Archie Biggers quickly. Mrs. Beamer had been raped eight months earlier and the time necessary to arrange a line-up certainly would not have affected her identification. Indeed, the time lapse, well known to the police, should have been sufficient to mandate a line-up to police conscientiously seeking an impartial, dispassionate identification.

Again in subsection II at pages 12–13 it is argued:

Archie Biggers was also denied his right to assistance of counsel at the time of his identification, clearly a "critical stage" in his case. Escobedo v. Illinois, 378 U.S. 478, 486 [84 S.Ct. 1758, 12 L.Ed.2d 977] (1964). The police were without a clue to the identity of the man who had raped Mrs. Beamer. If she could identify a man it would certainly form at least the

basis for prosecution. If counsel had been present he could have done several things to insure an impartial test. He could have requested a line-up, or alternatively some other plan to assure conditions designed to avoid suggestion. If present, counsel could have questioned the prosecutrix during identification before she had placed herself in the position of making a positive identification. It is quite possible that his mere presence would have served to counterbalance that of the police, and the inherent suggestiveness of police station identification of one in custody. Had counsel been present he might have prevented the police from requiring the petitioner to speak the words of the rapist, words which carried an inherent suggestion of guilt. Or counsel might have advised his client to remain silent.

The circumstances of this case, taken separately and in combination, establish violations of the due process clause of the Fourteenth Amendment, and through it, violations of the Fifth and Sixth Amendments.

In the State of Tennessee's "Brief in Opposition to the Petition for Writ of Certiorari" it is argued at page 8:

Petitioner urges this Court to grant certiorari in this case because he contends that the identical question raised here is presented in the two (2) cases mentioned in which this Court has previously granted certiorari. Respondent respectfully insists that the questions are not the same.

It is clear from an analysis of United States ex rel. Stovall v. Denno, *supra,* and Wade v. United States, *supra,* that the question in those cases is not whether it is a violation of due process for a victim to identify an accused during an identification procedure at police headquarters, but whether it is incumbent upon the State to provide counsel to the accused at the identification procedure following the commencement of criminal proceedings against him. The case at bar is un-

like those cases inasmuch as at the time of the identification of the accused by Mrs. Beamer, no criminal proceedings had commenced insofar as this matter is concerned. The plain truth is that the petitioner had been arrested on a separate charge and as a matter of general inquiry Mrs. Beamer was called to see whether or not she could identify him.

Once certiorari was granted the briefs decidedly show that the Supreme Court had before it for review each and every aspect of the identification procedure so as to assess the "totality of circumstances". Beside the point that the "totality" test raises a factually all encompassing due process issue, in Biggers' Supreme Court brief under the subtitle "Argument" the broadest due process argument is made. Therein, at pages 8–18, it is argued:

*"The Circumstances of Petitioner's Pre-Trial Identification and Its Use as Evidence at Trial Deny Him Due Process of Law as Guaranteed by the Fourteenth Amendment.*

"The decisions of this Court in United States v. Wade, 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967) and Gilbert v. California, 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178] (1967) holding pre-trial identification in absence of counsel violates the Sixth Amendment, would require reversal in this case but for the decision in Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967), barring their retroactive effect.[6] Like Wade and Gilbert, Biggers was denied the right to the assistance of his retained counsel by the police holding a pre-trial identification proceeding in his attorney's absence.[7] The Court remanded *Wade* to determine whether a subsequent in-court identification should be excluded as the tainted product of the line-up identification, while *Gilbert* excluded in-court testimony of the pre-trial identification *per se.* As petitioner was convicted on the testimony of the prosecutrix's pretrial identification at a showup (she did not attempt to identify him at trial) where petitioner was un-

represented by counsel, *Biggers* would be entitled under *Gilbert* to exclusion of the identification.[8]

"A.   *The Failure of the Police to Hold a Lineup Violates Due Process.*

"The question, therefore, is that left open in Stovall v. Deno, 388 U.S. 293, 301, 302 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967), whether the pre-trial confrontation between petitioner and the victim 'was so unnecessarily suggestive and conducive to irreparable mistaken identification that [petitioner] was denied due process of law.  This is a recognized ground of attack upon a conviction independent of any right to counsel claim.  Palmer v. Peyton, 359 F.2d 199 (C.A. 4th Cir. 1966).'  The accused in *Stovall* was identified without a lineup, a procedure of acknowledged suggestiveness: 'The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned' (388 U.S. at p. 302 [87 S.Ct. 1967]).  Nevertheless, due process was not violated in *Stovall* solely because of exigent circumstances.  The victim was in danger of death, and if an identification was to be made at all 'an immediate hospital confrontation was imperative' (*Ibid.*).

"The extraordinary need for an immediate identification without a lineup present in *Stovall* is completely absent here.  On the contrary, at the time of the identification, Biggers was in police custody on an unrelated charge and continuously available for identification.  Similarly, Mrs. Beamer was, and had been for seven months, continuously available to identify possible suspects.  Her health was unimpaired, and no other factors made an immediate identification by her without a lineup 'imperative.'  Held without exigent compelling circumstances, Biggers' showup identification violated due process under the reasoning of Stovall v. Denno, *supra*.

"United States v. Wade, 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967) and Gilbert v. California, 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178] (1967)

found need of impartial and selective identification procedures, and thereby the need for counsel, even when a lineup is held in part because the reliability of any identification of a stranger is severely limited by normal human fallibilities of perception and memory.  A showup, on the other hand, results in the maximization of suggestion that the suspect is the guilty party and suggestion is the ' "one factor which, more than anything else, devastates memory and plays havoc with our best intended recollections * * *." ' [9] Suggestion is in large part the product of restricted selectivity offered the witness in the identification process.  Instead of being forced to choose between several persons with different heights, weights, profiles and voices, Mrs. Beamer was confronted with a single individual whose suspected guilt the police communicated by presenting him alone and in custody.  The witness is free to accept or reject this police judgment, but not to choose.  With good reason, therefore, the showup is labelled 'the most grossly suggestive identification procedure now or ever used by the police.'  Wall, Eyewitness Identification in Criminal Cases 28.  See also, Stovall v. Denno, 388 U.S. 293, 302 n. 5 [87 S.Ct. 1967, 18 L.Ed2d 1199] (1967).[10]

"In identifying petitioner, Mrs. Beamer relied particularly on her recollection of a voice she had not heard in seven months, but selectivity is decreased even more when identification is by voice.  An identification by physical appearance may rest upon various characteristics, one or a combination of which may be particularly striking, such as the shape of a nose or mouth, skin complexion, scars, or height and weight.  Voice identification rests merely upon the tone and timbre of a voice, as well as an individual's speech peculiarities.[11]  When few words are spoken and no special speech peculiarities are present, as in this case, only tone and timbre are left to provide identification.  Selectivity is at the barest minimum; the probability of error is maximized.  Biggers, moreover, spoke

softly during the identification (R. 17). It is difficult to believe the intruder spoke this way during the assault and rape. The unreliability of voice identifications as compared to physical identifications, with the resultant increased necessity for a lineup, was recognized by the Fourth Circuit in Palmer v. Peyton, 359 F.2d 199, 201–202 (1966):

> " 'Where the identification is by voice alone, the absence of some comparison involves grave danger of prejudice to the suspect, for as one noted commentator has pointed out: "[E]ven in ordinary circumstances one must be cautious and accept only with reserve what a witness pretends to have heard * * *." ' "

"This Court rigorously questioned the reliability of all identification testimony in United States v. Wade, *supra*, and quoted with approval Mr. Justice Frankfurter's observation that: 'The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.' The Case of Sacco and Vanzetti 30. If this characterization applies to an identification by lineup, where comparison and selectivity are greatest and suggestion minimal, it applies with far greater force to the showup in this case where Mrs. Beamer could only accept or reject police suspicion that Archie Biggers was the rapist, and where the showup identification was the sole evidence of guilt, see *infra* pp. 101–102.

"The holding in *Stovall* that absent unusual circumstances a show-up violates the due process rights of an accused is also soundly rooted in the policy adopted in United States v. Wade, 388 U.S. 218 [87 S.Ct. 1926, 181 L.Ed.2d 1149] (1967) and Gilbert v. California, 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178] (1967). Those cases envision that 'presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial.' [9] (388 U.S. at p. 236 [87 S.Ct. 1926]). Suggestion is to be prevented by an attorney calling the attention of the police to identification procedures which produce it and by proposing safeguards. For the attorney to play a practically meaningful role as insurer of the integrity of the pre-trial identification proceedings, practices such as the showup which result in undue suggestion must be condemned or counsel is reduced to the role of passive observer, unable to prevent unreliability and reduced to attempting to expose it after the fact at trial. If counsel is unable to assert that a procedure as destructive of reliability as the showup is unconstitutionally suggestive, it is difficult to see how he will be able to assist law enforcement as *Wade* presupposes 'by preventing the infiltration of taint in the prosecution's identification evidence' (388 U.S. at p. 238 [87 S.Ct. 1926]).

"*B. The Circumstance of the Identification and Its Use at Trial Violate Due Process.*

"This case, however, goes far beyond *Stovall, supra*. The record affirmatively shows that petitioner's identification, and the use made of it by the state, denied him the fair trial guaranteed by the Fourteenth Amendment. The circumstances which denied Archie Biggers due process will be separately examined, but, of course, their prejudicial impact upon his trial is cumulative.

"*First*. Prior to the police call 'to look at a suspect' Mrs. Beamer was particularly open and susceptible to suggestive influence. The crime had occurred seven months earlier and had lasted at the most 30 minutes; inevitably the sharpness of her memory had faded. Mrs. Beamer, by her own admission at trial, was terrified by fear of violence to herself and children. When asked (R. 14):

> "Q. 'Are you able to describe this man other than seeing a butcher knife?'

"She replied:

> "A. 'No, other than I remember the blade being shiny.'

The crime took place at night. Mrs. Beamer was grabbed in an unlit hallway

and marched through an unlit kitchen to railroad tracks and then to a wooded area. At trial, she gave only a general explanation of the characteristics which led her to identify petitioner. As the Court said in *Wade,* the danger of suggestion is 'particularly grave when the witness' opportunity for observation was insubstantial. \* \* \*' (388 U.S. at p. 229 [87 S.Ct. 1926]).

"*Second.* The police suggested that the petitioner was the rapist when they arrived at Mrs. Beamer's home and asked her to go 'look at a suspect.' Inherent in the word "suspect" was the suggestion that the police had sufficient evidence linking the petitioner to the crime to warrant holding him at the police station for her identification. Thus the normal expectation of a witness that the guilty person will be present at the identification was substantially increased by the police. Cf. Williams, Proof of Guilt, 96.

"*Third.* At the station house Mrs. Beamer first saw Archie Biggers in the custody of five police officers, all of whom remained present during the identification. The sheer number of officers, implying the importance of the petitioner as a 'suspect', may well have allayed any thought by the witness that this might not be 'the man.'[12] On the other hand, the number of officers may have increased her fear of contradicting the police as to the identity of a man regarded by them for reasons unknown to her as a 'suspect.'

"*Fourth.* When Mrs. Beamer did not identify Biggers by his physical appearance, the police required him to speak words spoken during the attack—'Shut up or I'll kill you.'—and eventually his compelled speech was presented to the jury at trial. There is little that could have been more suggestive of his guilt. Mrs. Beamer had not indicated that the rapist had particular speech mannerisms which required those words to be spoken, and even if he had had speech peculiarities he could have spoken other sentences of phrases containing each of

these words. Whether or not a violation of petitioner's Fifth Amendment rights (see Argument II, *infra*) use of the rapist's precise words was unnecessarily suggestive.

"Wall has evaluated the latter two suggestive techniques used in this case. He states that 'As bad as a showup is, there are a number of ways it can be made worse. \* \* \* One method is to point out the suspect to the witness even before the showup, indicating his status as suspect. \* \* \* If this practice is not deemed suggestive enough, then the suspect, when shown alone, can be required to act or speak in the manner in which the perpetrator of the crime is supposed to have acted or spoken, a method adopted, for example, in the Sacco-Vanzetti case.' Eyewitness Identification in Criminal Cases 30.

"*Fifth.* Archie Biggers was unprepared and unequipped to protect himself against an identification made unfair by suggestions to the witness. He was 16 years old, had a ninth grade education, and apparently no previous police record.[13] His immaturity, relative lack of education, and unfamiliarity with police procedures combined to make it difficult for him to intelligently safeguard himself against suggestive influence at the identification. Cf. Haley v. Ohio, 332 U.S. 596 [68 S.Ct. 302, 92 L.Ed. 224] (1948); Gallegas [Gallegos] v. Colorado, 370 U.S. [49] 52 [82 S.Ct. 1209, 8 L.Ed.2d 325] (1962); In re Gault, 387 U.S. 1 [87 S.Ct. 1428, 18 L.Ed.2d 527] (1967).[14] This vulnerability to police procedures suggesting his guilt was further increased by the failure to notify Biggers' family of the identification despite the fact that his mother was available, the police having notified her earlier on August 17th that her son was being held on an unrelated charge. While the nonretroactivity of the Sixth Amendment holding of *Wade, supra* and *Gilbert, supra,* precludes reversal solely on the basis of lack of counsel, the consequences of an identification proceeding held without an attorney present must be noted as they affect an accused's right

to a fair trial. Cf. Davis v. North Carolina, 384 U.S. 737, 740, 741 [86 S.Ct. 1761, 16 L.Ed.2d 895] (1966). Placed in an unfamiliar situation and seized by the natural fear of one whose liberty depends upon another, an accused is unlikely either to reconstruct completely or be capable of testifying to all the suggestive influences which would reflect on the witness' impartiality and credibility. An accused as young and inexperienced as Archie Biggers is particularly affected by these disabilities. We can never know if additional suggestive influences may have further tainted the identification in this case, but we do know that the procedure employed maximized potential suggestion without the protective presence of counsel to protect the right to cross-examine, Pointer v. Texas, 380 U.S. 400, 404 [85 S.Ct. 1065, 13 L.Ed.2d 923] (1965).

"*Sixth.* The pre-trial identification was exploited at trial by the State's complete reliance on the tainted identification. Although she came to within a foot of the assailant, Mrs. Beamer's young daughter could not identify Biggers. Mrs. Beamer did not attempt an in-court identification. The pre-trial identification was offered by the state and was presented emphatically to the jury as the difference between guilt and innocence. No other evidence of guilt was presented although testimony elicited by the prosecution from four police officers as to what transpired at the identification made it appear to the jury that Mrs. Beamer's testimony was corroborated,[15] see United States v. Wade, 388 U.S. at p. 247 [87 S.Ct. 1926] (opinion of Mr. Justice Black). According to the prosecuting attorney, the excitement of the crime was proof of accuracy of the subsequent identification. Professor Borchard's studies show, however, "that the emotional balance of the victim or eyewitness is so disturbed by his extraordinary experience that his powers of perception became distorted and his identification is frequently most untrustworthy." Convicting the Innocent, XIII (1961). This is especially true in a rape prosecution where, as the Court has recognized, identification presents 'a particularly hazard that a victim's understandable outrage may excite vengeful or spiteful motives' United States v. Wade, 388 U.S. at p. 230 [87 S.Ct. 1926].

"*Seventh.* Without exception, the state could have employed procedures to safeguard the fairness of the identification and trial but did not do so. There was no practical impediment to a lineup. The witness need not have been told Biggers was a suspect. He did not have to repeat the precise language used by the criminal. Parents and counsel were available and could have been present. The number of officers at the identification was surely excessive and their testimony at trial served only to prop up a thin case. No in-court identification was offered. It was unnecessary for the state to initiate reference to prejudicial newspaper accounts of Biggers' arrest and identification or to permit the jury to learn that Biggers spoke the words of the criminal. Finally, it may have been good advocacy for the prosecuting attorney to tell the jury that 'violence and terror * * * fixes these matters indelibly in a person's mind' (R. 177) but it hardly speaks of dedication to 'making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime' United States v. Wade, 388 U.S. at p. 256 [88 S.Ct. 1926] (opinion of Mr. Justice White).

"The unfairness which began with the police labelling petitioner a 'suspect', extended through an identification replete with suggestion that he was the rapist from which he could not safeguard himself, and culminated at a trial in which the tainted identification was the sole basis of conviction. At every turn the police acted in such a way as to make a reliable identification impossible. Archie Biggers has been denied the fundamental fairness guaranteed him by the due process clause of the Fourteenth Amendment and his conviction should be reversed."

In response to this argument, the State of Tennessee countered, in its main brief in opposition to the merits of the appeal, arguing:

Although the petitioner was not deprived of his Fifth Amendment privilege against self incrimination nor was he deprived of his Sixth Amendment right to counsel, this Court is asked to review the circumstances of the identification to determine whether or not they were so suggestive as to deprive the petitioner of his right to a fair trial as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

This Court in the case of Stovall v. Denno, *supra,* held that although the accused was not denied his Sixth Amendment rights because of the prospective application of *Wade* and *Gilbert,* the matter could be reviewed in order to determine whether a fair trial was given him. This review for the purpose of determining whether or not the identification confrontation was fair, was made upon the authority of Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966). This Court stated that a "claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it". It is necessary that this Court review the circumstances surrounding the identification of the petitioner in the case at bar. It is significant that the Court in the case of Palmer v. Peyton reviewed the circumstances and determined that the accused therein was deprived of a fair trial as guaranteed by the Fourteenth Amendment although that particular question had never been raised below. It is also significant that the Court in the *Palmer* case cited no authority upon which it reviewed the circumstances surrounding the identification.

The petitioner Biggers was arrested during the night of August 16, 1967, taken to juvenile court and released by the juvenile court to the metropolitan police of Nashville. Mrs. Beamer had been raped months earlier and had from time to time visited the police department in an attempt to identify suspects. She was called to identify if possible the petitioner while he was being held on a separate and unrelated charge. He had been advised at the juvenile court of his constitutional rights as had his mother. He was displayed to Mrs. Beamer at police headquarters and asked to speak certain words. She had reviewed police files and viewed suspects during the months since her rape. The identification which she made of Biggers was not the product of suggestion but was the result of many months of investigation. Mrs. Beamer identified the petitioner in Court also. There is no indication that her identification in the courtroom was the result of police suggestion nor is there any indication that her identification in the courtroom was the result of or influenced by her identification before trial.

In the *Stovall* case the accused was handcuffed to one of five police officers who, along with members of the District Attorney's Office, brought him to a hospital room in which the victim of the assault was confined. He was identified by the victim from her hospital bed after having been required to speak "words and voice identification". This Court held that the circumstances were not such as to indicate that the petitioner Stovall was deprived of his right to a fair trial as guaranteed by the Fourteenth Amendment. The facts in the *Stovall* case are very similar to the facts in the case at bar.

This Court should affirm the conviction of the petitioner for rape. There is nothing in the record to indicate that the petitioner has been deprived of his right to due process.

Following the equally divided decision by the Supreme Court, Biggers petitioned for rehearing arguing:

Subsequent to the Court's ruling in petitioner's case, certiorari has been granted to consider, in the case of another state prisoner, those circum-

stances which result in an identification procedure violating the Due Process Clause of the Fourteenth Amendment, Foster v. California, No. 638 Misc., 36 U.S.L. Week 3374 (3/25/68). *Foster* involves a lineup which is alleged to have been unconstitutionally conducted. As petitioner was not accorded the elementary protection of a lineup—and the record is barren of evidence justifying the failure to hold one—reversal in *Foster* would, *a fortiori,* affect, if not determine, final resolution of petitioner's constitutional claim. An intervening circumstance such as "the fact that the same or a related issue has come before the court in other cases still pending" is a common ground for grant of rehearing. Stern and Gressman, Supreme Court Practice, 3rd Ed. 389; see Pickett v. Union Terminal Co., 313 U.S. 591 [61 S.Ct. 1115, 85 L.Ed. 1546] (1941); 314 U.S. 704 [62 S.Ct. 55, 86 L.Ed. 563] (1941); 315 U.S. 386, 389, 394 [62 S.Ct. 659, 86 L.Ed. 914] (1942). It is plainly appropriate and just that the results in these two cases conform. Unless it is beyond doubt that principles announced in *Foster* will not bear upon petitioner's claim, this petition should be granted.

The petition was denied.

On the basis of this appellate record, it seems impossible to simply assume that the Supreme Court failed to assess each and every aspect of the identification procedure and considered only the voice identification issue as conjectured by the majority opinion. I view Mr. Justice Douglas' dissenting opinion in which the due process issue is discussed as a significant indication of the all inclusive factual review given that issue. In short, I believe that the only conclusion which may be drawn from the appellate record in the Supreme Court is that all facts surrounding the pretrial identification were plenarily reviewed by the Court, and the proceedings in the District Court, pursuant to the request for habeas corpus, not only could not raise any new or unexplored factual or legal matters with respect to

this issue, but were a mimicry of the Supreme Court review.

If, as the appellate record indicates, there was a complete review by the Supreme Court of the identification procedure applying the appropriate legal test, the next question dividing this Court is what effect the evenly divided decision had on the merits of that issue. I believe that logically, historically and legally a decision reached by an evenly divided court is on the merits. The majority correctly states that an equal division of an appellate court does not settle any principle of law. Logic, of course, compels this result since to establish a principle of law having precedent value a majority decision is required. Both Etting v. United States Bank, 24 U.S. (11 Wheat.) 59, 6 L.Ed. 419 (1826), and Durant v. Essex Company, 74 U.S. (7 Wall.) 107, 19 L.Ed. 154 (1868), so hold. However, I disagree with the majority's statement that an equal division of an appellate court does not settle an issue of fact. To the contrary, the expression "finally disposed of" in Durant v. Essex Company, *supra,* I believe means a conclusive decision on the facts. In addition, in Hertz v. Woodman, 218 U.S. 205, 213–214, 30 S.Ct. 621, 623, 54 L.Ed. 1001 (1909), it is stated:

> "Under the precedents of this court, and, as seems justified by reason as well as by authority, an affirmance by an equally divided court is, as between the parties, a conclusive determination and adjudication of the matter adjudged, * * * "

And, in United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796 (1941), it is stated that while an affirmance of a judgment by an equally divided court is not an authoritative precedent it is "conclusive and binding upon the parties as respects that controversy". See also, United States v. Reeside, 19 L.Ed. 391 (1868).

While this rule is well established in civil cases, because of the novelty of the problem, there are only a few criminal cases which have explored the effect of a judgment arrived at by an equally di-

**110**

vided court. However, several state courts having been presented with the problem in criminal cases have concluded that an affirmance by an equally divided court is, like in a civil case, on the merits of the issues presented and ends the dispute over those issues. See *Chahoon v. Commonwealth*, 62 Va. 822, 825 (1871), construing a statute; and see *State ex rel. Hampton v. McClung*, 47 Fla. 224, 37 So. 51 (1904); *Ex parte White*, 131 Fla. 83, 178 So. 876 (1938); *Dean v. State*, 173 Miss. 254, 309–310, 162 So. 155 (1935), interpreting the common law.

The only federal criminal case besides *Biggers* and *Carter, supra*, which research has uncovered involving a judgment arrived at by an equally divided court, is *United States v. Worrall*, 2 U.S. (2 Dall.) 384, 1 L.Ed. 426 (1798). There the defendant was found guilty in the United States Circuit Court of attempting to bribe a United States Commissioner of Revenue. Mr. Justices Chase and Peters were unable to agree upon the question of whether the federal courts had common law jurisdiction in criminal cases, and there being no right of criminal appeal at that early date to the Supreme Court, of which the Justices were also members, the judgment was affirmed because of the equally divided court and punishment was imposed. Admittedly, the affirmance resulting from this divided court was a technical affirmance, but nevertheless it was a final judgment upon which a prison sentence and fine were imposed. See generally, 4 C.J. § 1121; 24B C.J.S. Criminal Law § 1945. These precedents persuade me that an affirmance by an equally divided court in a criminal case, following review of the issues presented, *is on the merits of the issues* even though the affirmance must follow because the judges are equally divided. And, as the appellate record clearly shows, the issue of the constitutionality of Biggers' pretrial identification has been completely reviewed on the totality of facts by the Supreme Court. Accordingly, I would hold that while petitioner is not barred from raising new issues or issues not fully litigated in his habeas corpus petition, he is, however, collaterally estopped from relitigating the merits of the identification issue since that issue has been plenarily litigated and resolved on the merits against him. Thus, I would reverse the judgment and remand the case to the District Court for consideration of the other constitutional issues raised by petitioner's petition for a writ of habeas corpus.